EDWARD J. SMYKE, as Limited Administrator of the Estate of KENNETH R. SMYKE, Deceased, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 30738.)

Court of Claims, November 24, 1952.

*Ralph E. Wickins* for claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Lawrence H. Wagner* of counsel), for defendant.

GORMAN, J. On the morning of April 18, 1949, Kenneth R. Smyke, a three-year, five and one-half-month-old infant, was visiting his paternal grandparents at Spring Brook Inn, oper-

ated by the grandparents in Caledonia, Livingston County, New York. The inn property was east of, and adjacent to, the grounds of the New York State Fish Hatchery which was maintained by the State for the propagation of trout. About thirty feet of inn property to the rear of the inn separated the building from the property of the fish hatchery. Neither property was fenced.

About 9:00 A. M. on April 18th, Kenneth's mother, who had accompanied him on the visit, allowed him to go out to play with his dog. Shortly thereafter, the dog was discovered, barking and wet, at the back door of the inn. The child's grandfather and uncle immediately began to search for him, and his body was discovered behind the dam in the main feeder of the fish hatchery about one hundred and twenty-five feet from the inn property. The body was lodged at the bottom of the dam against the dam boards and a lower opening through which water was released to the various pools maintained on the hatchery grounds. These open pools were approximately two and one-half feet in depth, and water for these pools was supplied by the main feeder which, in turn, obtained water from a natural stream known as Spring Creek. Spring Creek extended generally north and south over the hatchery property. The feeder led off the creek and then turned until it, too, extended north and south, generally parallel to the creek. Water flowed through this artificially constructed feeder toward the dam, in a northerly direction, at a rate of approximately 4,000 gallons a minute. The body was held against the dam opening by the force of the water.

The average water depth generally maintained in the feeder was between four and five feet. The water level of the dam could be regulated by the use of flashboards. At the time of the accident, the water was about five feet deep, and the dam was discharging through the bottom opening only due to an accumulation of silt, decayed vegetation and animal matter. The surface of the feeder was frequently covered with such an accumulation for a distance of four or five feet back from the dam.

The side walls of the feeder were approximately flush with the ground and were capped with concrete about eighteen inches wide. These walls showed erosion, and the capping was cracked, broken and depressed in many places, especially on the west side of the feeder near the dam. A four foot wide cement sidewalk ran east and west, at about a right angle to the feeder, and crossed the feeder immediately to the north of the dam.

Flashboards were loosely strewn on the ground at the dam between the walls of the feeder and the sidewalk which crossed it.

The public was invited to visit the grounds of the hatchery, no admission fee being charged. Picnic tables, arbors and a parking area were maintained on the grounds for the convenience of visitors, and children visting the hatchery were permitted to feed the fish popcorn and peanuts purchased on the grounds.

It is well established that the owner of property who expressly or by implication invites an individual or the public generally upon his land is liable to those who respond to his invitation for any unreasonably dangerous condition which results in injury to such person. (*Murphy* v. *City of Brooklyn,* 118 N. Y. 575.) A governmental entity which extends an invitation to its citizens to make use of its facilities for educational or recreational purposes owes to such citizens a duty of reasonable and ordinary care against known or foreseeable dangers. (*Caldwell* v. *Village of Island Park,* 304 N. Y. 268; *Curcio* v. *City of New York,* 275 N. Y. 20; *Clark* v. *City of Buffalo,* 288 N. Y. 62; *Peterson* v. *City of New York,* 267 N. Y. 204.) This duty exists irrespective of whether or not a fee is charged for the exercise of the privilege. (*Caldwell* v. *Village of Island Park, supra.*) If an owner of property, governmental or private, deems it advisable to open its property to the public, such owner must see that the property itself and the facilities thereon do not subject those invited to foreseeable harm or danger. The State, in the present instance, did not fulfill this duty. It knew that children visited the grounds of the hatchery and that they were accustomed to play and feed the fishes. It should, in the exercise of reasonable care, have anticipated that young children might wander along the sidewalk near the unprotected and deteriorating feeder to their injury, and it should, therefore, have taken measures to render this feeder and dam as harmless as possible to the visiting public. Instead of exercising such precautions, the State left the feeder and dam with relatively deep and swiftly flowing water entirely unfenced and unguarded; it allowed the walls to deteriorate and the cement capping to become cracked, broken and raised. It carelessly permitted loosely piled boards to remain in close proximity to the sidewalk and the edge of the dam; and it completely failed to erect any signs or other devices warning the public of the dangers to be encountered at the feeder and dam. In addition, extraneous matter was allowed to coat the surface of the feeder, and, at times, this

covering tended to give the illusion of solid ground to the water. It would have been a comparatively simple process to have placed the flashboards in a position in which they would have been unlikely to have caused anyone to trip or stumble upon stepping from the adjacent sidewalk, to have cleared the surface of the feeder of foreign substances, and to have placed fencing or rails around the feeder and dam to prevent anyone from accidently stumbling therein.

The presence of the sidewalk which crossed the feeder to the north of the dam, and the erection of an arbor in close proximity to the dam show clearly that the State expected the public to visit the area near the dam and feeder. This dam and feeder, in the condition in which they were maintained, were potentially dangerous to adults, and were imminently dangerous to children of tender years who would not comprehend the latently dangerous aspects of the situation. Our courts have held the owner of property to a greater duty of care to protect a child of tender years from dangers to be encountered thereon than would be required toward an adult. (*Di Biase* v. *Ewart & Lake,* 228 App. Div. 407.) The instincts, propensities and proclivities of a young child, his lack of appreciation of danger and possible indiscretions must be taken into consideration in measuring the degree of care owed to him. (*Di Biase* v. *Ewart & Lake, supra; Perry* v. *Rochester Line Co.,* 219 N. Y. 60; *Boylhart* v. *Di Marco & Reimann,* 270 N. Y. 217; *Bergman* v. *Feitelowitz,* 253 App. Div. 323.) We believe that the infant decedent, visiting at an inn in such close proximity to the unfenced hatchery grounds to which a general invitation was extended to the public to visit and inspect, was entitled to better protection and that the State owed to him a duty of reasonable care which it did not fulfill.

The infant decedent was not guilty of contributory negligence whatever may have been his actions prior to his death. (*Verni* v. *Johnson,* 295 N. Y. 436.)

We conclude that under all of the circumstances of the present case, considering that the dam and feeder were artificial constructions, that they were readily accessible to the public, that they were in a deteriorating condition, that it was practicable to guard the dangerous area, and that the presence of children was not only anticipated, but solicited, the State of New York was negligent in the maintenance of the feeder and dam at the Caledonia State Fish Hatchery and that this negligence was a proximate cause of the death of the infant, Kenneth R. Smyke.

The claimant is entitled to an award against the State of New York in the amount of $6,369, with interest. The foregoing constitutes the written and signed decision of the court. (Civ. Prac. Act, § 440.)

Let judgment be entered accordingly.